UNITED STATES of America,
Plaintiff–Appellee,

v.

Leroy ROBERSON, Jr., Lonnie Keeper,
and LaWanda Whitlock, Defendants–
Appellants.

No. 92–4589.

United States Court of Appeals,
Fifth Circuit.

Nov. 1, 1993.

Randal B. Gilbert, Lee, Gilbert & Morrison, Tyler, TX (court-appointed), for Roberson.

Gregory G. Fenlon, St. Louis, MO, for Keeper.

Michael Carroll, Tyler, TX (court-appointed), for Whitlock.

Wes Rivers, Asst. U.S. Atty., Bob Wortham, U.S. Atty., Tyler, TX, for plaintiff-appellee.

Before POLITZ, Chief Judge,
REYNALDO G. GARZA and JOLLY,
Circuit Judges.

POLITZ, Chief Judge:

Lonnie Keeper, Leroy Roberson, and LaWanda Whitlock appeal their convictions for various drug-trafficking offenses. We affirm all convictions except those based on the Travel Act.

*Background*

Shortly after midnight on Monday, October 14, 1991, Roberson, Keeper, and Whitlock were passengers in a minivan driven northbound by Darlene Linda McCleod on state highway 59 in Panola County, Texas. State Trooper Barry Washington, while pursuing a speeder, passed the van and observed its out-of-state license plates and four black occupants. Shortly thereafter Trooper Washington crested a hill, pulled onto the shoulder of the highway, doused his lights, and trained his radar gun on northbound traffic.

As the van approached, the radar gun registered 58 miles per hour, three miles per hour above the speed limit. The van, apparently the only moving vehicle on that stretch of road, changed lanes to distance itself as it passed the vehicle on the right shoulder. Trooper Washington noted that the lane change was unaccompanied by a signal and obviously regarded this as a serious traffic offense when committed by an out-of-state driver in Panola County. He immediately gave chase and pulled the van over.

Approaching the vehicle, Trooper Washington instructed McCleod to produce her driver's license, registration, and proof of

insurance. McCleod informed him that the car was leased by a third party and produced a copy of the lease agreement. The lease to one Cheryl Allen did not identify McCleod as an authorized driver and the lessee was not among the passengers. Trooper Washington began to suspect that the vehicle might have been stolen. At this point, McCleod volunteered that she was a friend of Allen and that Allen was in St. Louis. McCleod claimed to be returning home after taking her mother to her grandmother's home in Houston.

Trooper Washington then asked the passengers for identification. Roberson could not produce a driver's license, but claimed responsibility for the car, stating that Allen had loaned it to him. Roberson told the trooper that Allen was still in Houston and would be returning to St. Louis in another vehicle. His suspicion further aroused, Trooper Washington decided to call Deputy David Deter for backup.

Upon Deputy Deter's arrival, the pair asked McCleod for her grandmother's phone number to confirm her story; McCleod could recall neither the number nor the address. Trooper Washington then requested McCleod's permission to search the luggage inside the van, and McCleod agreed. During the course of this search Trooper Washington noted an ether-like odor inside the van, a smell associated with cocaine. He immediately called for further assistance and visually inspected the outside of the van.

It was then that Trooper Washington noticed an unusually clean spare tire.[1] He informed Deputy Deter of his suspicion that the tire contained cocaine, and then retrieved a pair of pliers to remove the cap on the valve stem; the cap was too tight to remove with his bare hands. Deputy Deter noted that while the spare tire was on a 15–inch rim, the tires on the van were on 14–inch rims.

In time additional backup arrived with a drug-sniffing dog. The third officer crawled beneath the van and released the air from the tire and detected the smell of mustard, frequently used to mask the odor of cocaine. The spare tire was then removed and presented to the dog, who alerted. After disassembling the tire in the appellants' presence at a local garage, the officers discovered that it contained 6.99 kilograms of cocaine.

The defendants were arrested and interviewed. McCleod, claiming to be Roberson's girlfriend, said that Roberson had simply asked her to accompany him on a trip from St. Louis to Houston. The couple had then traveled with Whitlock and Larry Keeper[2] to Houston. McCleod explained that Larry Keeper had rented the minivan and later met Michael Keeper at a Houston hotel on the afternoon of October 12. Lonnie and Larry Keeper then left in the minivan, with Michael Keeper following close behind in a blue Chevy Corsica with Missouri plates. McCleod further related that all three men returned at about 8:30 p.m. and that she and her traveling companions left the next day. She claimed that Roberson had told her to fabricate the story about dropping her mother in Houston.

During her interview, Whitlock claimed that Larry Keeper had approached her boyfriend and offered to pay him $200 for her presence on the trip; Whitlock was to be paid an additional $500. Whitlock understood that the purpose of the trip was to purchase cocaine, and that the Keeper brothers were involved in cocaine trafficking. Before leaving for St. Louis, Larry Keeper had shown her a suitcase supposedly containing $40,000. She also claimed that Larry Keeper had previously delivered $4,000 worth of crack cocaine to an individual known as David Turner. She further stated that she, McCleod, Roberson, and Larry Keeper left St. Louis in the minivan and met Michael Keeper, who drove the blue Corsica.[3] She

---

1. Trooper Washington claimed to have found contraband inside spares on at least 30 prior occasions.

2. At trial, McCleod testified that Lonnie Keeper was also in the car, but that she had forgotten to relate that fact during her interview.

3. She recalled at trial that Lonnie Keeper also rode in the van to Houston.

would later testify at trial that while the officers were removing the suspect tire from its rim she had asked Lonnie Keeper why, to which he responded "it's full of coke."

Roberson claimed to have been paid $150 dollars to help drive the van and to locate cars in the Houston area for the Keeper brothers. He admitted his awareness of the Keepers' involvement in illicit drug transactions but denied any knowledge of the cocaine-laden spare.

The charges against McCleod were dismissed shortly before trial. Lonnie Keeper and Roberson were convicted of conspiracy to possess cocaine with intent to distribute, possession with intent to distribute cocaine, and violation of the Travel Act. Whitlock was convicted of possession with intent to distribute cocaine and of violating the Travel Act. All timely appeal.

### Analysis

Each defendant challenges, *inter alia*, the sufficiency of the evidence. Lonnie Keeper also complains of Trooper Washington's stop and search of the minivan.

#### Fourth Amendment Limitations on Search and Seizure

a. The stop

■ A motorist's expectation of privacy yields to a routine traffic stop for such violations as speeding or, as in this case, changing lanes without signaling.[4] Typically, a passenger without a possessory interest in an automobile lacks standing to complain of its search because his privacy expectation is not infringed.[5] Whereas the search of an automobile does not implicate a passenger's fourth amendment rights, a stop results in the seizure of the passenger and driver alike.[6] Thus, a passenger of a stopped automobile does have standing to challenge the seizure as unconstitutional. With these tenets in mind, we first consider Keeper's contentions.

If the minivan in which Keeper rode had been stopped or further detained on the suspicion that it carried drugs, then the stop or prolonged detention would have to be justified under the now familiar *Terry*[7] test.[8] In that event, the stop would have been unreasonable and the fruits thereof inadmissible absent an actual, reasonable suspicion that drugs were in or upon the van.[9] That, however, was not the case here. Trooper Washington testified at the suppression hearing that he stopped the van simply to investigate its failure to signal before changing lanes. He maintained that his stop did not exceed that scope until after he developed a reasonable suspicion that drugs were present. Keeper contends, albeit with little force, that the van did signal before changing lanes and that Trooper Washington's explanation is merely pretextual.

4. *United States v. Shabazz*, 993 F.2d 431 (5th Cir.1993).

5. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *cf. United States v. Kye Soo Lee*, 898 F.2d 1034 (5th Cir.1990) (holding that bailees operating a truck had standing to challenge search thereof), *cert. denied*, —— U.S. ——, 113 S.Ct. 1057, 122 L.Ed.2d 363 (1993).

6. Heretofore we have implied but not expressly so ruled. *E.g., United States v. Cardona*, 955 F.2d 976 (5th Cir.) (finding no standing to challenge search but reaching merits of challenge to stop), *cert. denied*, —— U.S. ——, 113 S.Ct. 381, 121 L.Ed.2d 291 (1992). Our circuit colleagues have been more direct. *E.g., United States v. Erwin*, 875 F.2d 268 (10th Cir.1989); *United States v. Portwood*, 857 F.2d 1221 (8th Cir.1988), *cert. denied*, 490 U.S. 1069, 109 S.Ct. 2073, 104 L.Ed.2d 638 (1989). *Accord, United States v. Clark*, 822 F.Supp. 990 (W.D.N.Y.1993); *United States v. Lawson*, 782 F.Supp. 1546 (S.D.Fla.

1992). *See also United States v. Powell*, 929 F.2d 1190, 1195 (7th Cir.) (citing *Erwin* and "numerous state courts" that have concluded that a passenger has standing to challenge a vehicle stop), *cert. denied*, —— U.S. ——, 112 S.Ct. 584, 116 L.Ed.2d 609 (1991).

7. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

8. *United States v. Guzman*, 864 F.2d 1512 (10th Cir.1988) (finding fourth amendment violation where stop escalated into custodial interrogation on an unrelated matter), *cited with approval in United States v. Kelley*, 981 F.2d 1464 (5th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2427, 124 L.Ed.2d 647 (1993).

9. In order to comply with the requirements of the fourth amendment, a "vehicle frisk," as it has come to be known, must be based on a reasonable suspicion. *See, e.g., United States v. Hernandez*, 901 F.2d 1217 (5th Cir.1990).

■ If Trooper Washington did *not* observe a traffic infraction—apart from the minor speeding offense which did not serve as a basis for the stop—before stopping the van and detaining its occupants, and if he simply acted on some vague suspicion, the fruits of the stop and subsequent search would be tainted and inadmissible in evidence. The question in the instant case therefore becomes whether Trooper Washington observed a traffic infraction before stopping the vehicle. There is no dispute that the vehicle changed lanes; Keeper concedes as much. Instead, Keeper argues, as he did in the district court, that Trooper Washington is mistaken in his belief that the van did not signal.[10] This polemic is oft-repeated daily in traffic courts across this country. In each case the issue is one of credibility, and in each case its resolution is left to the factfinder. Absent clear error, we will not disturb factual findings made on motions to suppress evidence.[11] Finding none here, we next turn to the pretext argument.

Keeper's argument that the traffic stop was a mere pretext to search for drugs is bolstered substantially by anecdotal evidence of Trooper Washington's remarkable record for warrantless drug arrests. It appears that in the past five years, Trooper Washington has arrested 250 people on drug charges, all after traffic stops. Of those, only four were warrant-authorized. Indeed, this court has become familiar with Trooper Washington's propensity for patroling the fourth amendment's outer frontier.[12] Nonetheless, sitting *en banc* this court, albeit divided, has

simplified the pretext analysis by eliminating challenges to seizures that otherwise have legal bases.[13] Hence, while we do not applaud what appears to be a common practice of some law enforcement officers to use technical violations as a cover for exploring for more serious violations, we may look no further than the court's finding that Trooper Washington had a legitimate basis for stopping the van. We thus must conclude that the stop did not violate the fourth amendment.

b. The detention and search

■ After Trooper Washington approached the van, conversation ensued regarding the purpose for the stop, the ownership of the vehicle, and the occupants' point of departure. We recently explained at some length that "a police officer's questioning, even on a subject unrelated to the purpose of the stop, is [not] itself a Fourth Amendment violation." [14] We merely note that when reviewing supposedly routine traffic stops, we are concerned primarily with the scope of the detention and the degree to which the driver and, concomitantly, the passengers reasonably perceive restraints on their liberty.

■ Had Trooper Washington handcuffed McCleod and directed the other occupants of the vehicle to step to the side of the road to be frisked, we would have a different case. As in *Shabazz*, however, the routine questioning here did not prolong the duration of initial, valid detention.[15] While, after that questioning, circumstances might warrant a finding of probable cause for the search to be

**10.** The appellants also contend that Trooper Washington's car was parked in a precarious position, thereby forcing the lane change. Accepting this as true would partially explain the van's failure to signal. In any event, the district court's rejection of this contention does not present clear error. The record entices, but does not compel the conclusion that Trooper Washington purposefully precipitated the lane change by positioning his vehicle to force the van to change lanes on short notice.

**11.** *Kelley, supra.*

**12.** *United States v. Ryles,* 988 F.2d 13 (5th Cir.) (finding failure to signal lane change explanation

for stopping suspect), *cert. denied,* — U.S. —, 114 S.Ct. 168, 126 L.Ed.2d 128 (1993).

**13.** *United States v. Causey,* 834 F.2d 1179 (5th Cir.1987) (en banc).

**14.** *Shabazz,* 993 F.2d at 436.

**15.** In this case, the driver could not produce any documentation suggesting that she was authorized to operate the vehicle, which was rented to someone who was not an occupant. Questioning the driver regarding matters such as ownership of the vehicle was thus within the scope of the routine traffic stop. *Shabazz,* 993 F.2d at 437. Moreover, because we find valid consent, we need not consider the propriety of the questioning of the passengers.

valid, we need not reach that issue. After pulling the van over and conducting the routine questioning, Trooper Washington received consent from the driver to search its contents. There is no basis for concluding that this consent was involuntarily given.[16] Moreover, Keeper, as a passenger, lacks standing to challenge the search of the car's contents.[17]

### Sufficiency of the Evidence

■ All three appellants challenge the sufficiency of the evidence to sustain their convictions for possession with intent to distribute a controlled substance and for violating the Travel Act. Keeper and Roberson also challenge their conspiracy convictions. Because we agree that the evidence was insufficient to prove any violation of the Travel Act, we do not reach the related complaint that the court erred in charging the jury on this offense.

Under the controlling standard of review, we typically assess evidentiary sufficiency in a criminal case by viewing the evidence and drawing all inferences most favorable to the verdict.[18] If the evidence so viewed would permit a rational jury to find all elements of the crime proven beyond a reasonable doubt, we affirm the conviction.[19] In the instant case, however, our review is limited to a search for plain error because the defendants did not renew their motions for acquittal at the close of the evidence.[20]

a. Conspiracy and possession with intent to distribute

■ In order to convict Keeper and Roberson for conspiracy the government had to establish that a conspiracy existed and

that each voluntarily participated therein.[21] Both claim that the evidence established nothing more than their coincidental presence in a van containing nearly seven kilograms of cocaine. While we have held that neither mere presence in close proximity to illicit drugs nor association with persons trafficking drugs is sufficient alone to establish knowing participation in a conspiracy or, for that matter, knowing possession of drugs, both are factors to be considered in weighing other circumstantial evidence.[22] In the case at bar, Roberson lied to Trooper Washington when asked about the purpose of his trip and his remuneration.[23] Testimony reflects that Keeper was aware of the presence of the cocaine in the tire before the tire was disassembled. This and other evidence, including the statements taken shortly after the arrests and the testimony of McCleod and Whitlock, suffices to pass plain error review. In view of their arrest while in actual possession of the drugs, the evidence also supports the convictions for the underlying possession offense.

■ Whitlock testified at trial, contrary to her prior statement, that she simply was accompanying McCleod on the trip to Houston. The jury was entitled to reject her new story and to believe, as she had previously stated, that she had been paid to act as a "sitter" to give cover to the group as they traveled between Houston and St. Louis. Her conviction for aiding and abetting the possession with intent to distribute is sufficiently supported by the evidence.

b. The Travel Act

■ The Travel Act, 18 U.S.C. § 1952, was submitted to Congress by then Attorney

16. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (consent, if voluntarily given, vitiates the need for circumstantial justification).

17. *United States v. Mendoza–Burciaga*, 981 F.2d 192 (5th Cir.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 356, 126 L.Ed.2d 320 (1993).

18. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

19. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

20. *United States v. Ruiz*, 860 F.2d 615 (5th Cir. 1988).

21. *United States v. Rodriguez–Mireles*, 896 F.2d 890 (5th Cir.1990).

22. *United States v. Natel*, 812 F.2d 937 (5th Cir. 1987).

23. Roberson explained that he was paid this money to locate cars for the Keeper brothers. The jury was entitled to discredit this explanation and to believe that he, like the other passengers, was paid to assist in the transport of the drugs to St. Louis.

General Robert Kennedy as an integral part of President Kennedy's ongoing war against organized crime. Its purpose is manifested by its plain language.

> (a) Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce with intent to—
>
> > (1) distribute the proceeds of any unlawful activity; or
> >
> > (2) commit any crime of violence to further any unlawful activity; or
> >
> > (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
>
> and thereafter performs or attempts to perform any of the acts specified [above] shall be fined not more than $10,000 or imprisoned for not more than five years, or both.
>
> (b) As used in this section *"unlawful activity" means (1) any business enterprise* involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances ... [emphasis added].

The purpose of the Act is clear: It aims to deny those engaged in a criminal business enterprise access to channels of interstate commerce.[24] It is not aimed at individual substantive offenses.[25]

▆▆▆▆ Courts considering same unanimously have concluded that the Act is not violated by a single episode of criminal behavior. Rather, in order to state a violation of the Travel Act, the government must allege: (1) that the accused traveled in interstate commerce or used facilities thereof, (2) with the specific intent to engage in or facilitate conduct listed in subsections (a)(1)–(3), (3) in furtherance of a criminal business enterprise. A criminal business enterprise contemplates a continuous course of business—one that already exists at the time of the overt act or is intended thereafter.[26] Evidence of an isolated criminal act, or even sporadic acts, will not suffice.[27]

In the instant case, Keeper, Roberson, and Whitlock all traveled in interstate commerce. The evidence, fairly viewed, also establishes beyond a reasonable doubt that each intended to transport controlled substances. The evidence does not establish, however, that any of the defendants were engaged in or intended to commence, a continuous course of criminal behavior. Nor does the evidence support a finding that they intended to facilitate another's existing criminal business enterprise.

Evidence does exist that Larry Keeper was engaged in drug transactions. This does not, however, permit a dispositive inference that Lonnie Keeper or his fellow passengers were engaged in or facilitating an ongoing criminal enterprise.[28] The government, as it did in the trial court, relies heavily on the quantity and purity of the drugs seized. While these facts will support an inference that the defendants intended to sell rather than consume the drugs,[29] it does not reason-

---

**24.** Courts have noted that Congress did not intend overly-sweeping interpretations of the Act. *E.g., United States v. Hathaway,* 534 F.2d 386 (1st Cir.), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976); *United States v. Peskin,* 527 F.2d 71 (7th Cir.1975), *cert. denied,* 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976).

**25.** *McIntosh v. United States,* 385 F.2d 274 (8th Cir.1967).

**26.** *United States v. Roselli,* 432 F.2d 879 (9th Cir.1970), *cert. denied sub nom. Tietelbaum v. United States,* 401 U.S. 924, 91 S.Ct. 883, 884, 27 L.Ed.2d 828 (1971); *United States v. Brennan,* 394 F.2d 151 (2d Cir.), *cert. denied,* 393 U.S. 839, 89 S.Ct. 117, 21 L.Ed.2d 110 (1968).

**27.** *United States v. Gallo,* 782 F.2d 1191 (4th Cir.1986), *cert. denied,* 490 U.S. 1070, 109 S.Ct.

2074, 104 L.Ed.2d 639 (1989); *United States v. Rinke,* 778 F.2d 581 (10th Cir.1985); *United States v. Lignarolo,* 770 F.2d 971 (11th Cir.1985), *cert. denied,* 476 U.S. 1105, 106 S.Ct. 1948, 90 L.Ed.2d 358 (1986); *United States v. Kaiser,* 660 F.2d 724 (9th Cir.1981), *cert. denied,* 455 U.S. 956, 102 S.Ct. 1467, 71 L.Ed.2d 674 and *cert. denied,* 457 U.S. 1121, 102 S.Ct. 2935, 73 L.Ed.2d 1334 (1982).

**28.** *See United States v. Thompson,* No. 92–1037, slip op. at 9 n. 14, 990 F.2d 625 (Table) (5th Cir. March 24, 1993) (refusing to impute one brother's guilty knowledge to another, solely on basis of blood relation).

**29.** *United States v. Prieto–Tejas,* 779 F.2d 1098 (5th Cir.1986).

ably support the inference that they intended to carry on or to establish a continuous business enterprise. As a general rule, evidence of mental state must, of necessity, be proved by circumstantial evidence. The same cannot be said with respect to the existence of a continuous criminal business. The evidence before us is insufficient to support the Travel Act convictions.

The judgment of the district court is REVERSED as to each Travel Act conviction and judgment of acquittal is RENDERED thereon. In all other respects, the convictions are AFFIRMED.