**UNITED STATES of America**

v.

**Sonia Luz LOPEZ–VALDEZ.**

**No. DR00–CR–216 WWJ.**

United States District Court,
W.D. Texas,
Del Rio Division.

June 7, 2000.

Robert E. Cadena, Assistant United States Attorney, Del Rio, TX, for plaintiff.

Francisco Morales, Assistant Federal Public Defender, Del Rio, TX, for defendant.

## ORDER

JUSTICE, Senior District Judge.

Sonia Luz Lopez–Valdez, defendant in the above-entitled and numbered criminal action, moves to suppress statements and evidence. On Tuesday, May 23, 2000, a hearing was held on this motion. For the following reasons, the defendant's motion shall be granted.

### FACTUAL FINDINGS

The government presented the testimony of two witnesses, Border Patrol Agents James Prejean and Ignacio Perez. The testimony of both witnesses is found to be credible. Both agents testified that on March 13, 2000, at approximately 5:40 P.M., they were parked on Highway 57 near Eagle Pass, Texas, when they received a call from their dispatcher. The dispatcher advised that an anonymous cell phone call had just been received. Agent Prejean's written report of the incident summarized the content of the anonymous call as follows: "A red Chevy Blazer with a Tasmanian devil on the rear wheel cover picked up suspected illegal aliens on Highway 57 near the Eagle Pass Checkpoint." Agent Prejean stated in his testimony that the caller included the fact that two people were picked up and that the Blazer was "headed out of town." "Out of town" was understood by the agents to indicate that the vehicle was headed in a northerly direction, away from Eagle Pass and the border. Agent Prejean also added that when a checkpoint is open, vehicles smuggling aliens have been known to drop off the aliens before reaching the checkpoint, letting the aliens travel around the checkpoint on foot, and then picking up the aliens on the other side.

The agents immediately headed north on Highway 57, in an effort to catch up with the vehicle described by the caller. Because the agents' vehicle had its lights on, all of the traffic in front of them pulled over as they approached. After traveling for approximately ten to 15 minutes, the agents identified a red Blazer, fitting the caller's description of the vehicle, approximately 20 miles outside of Eagle Pass, near a rest area. The Blazer pulled over as the agents' vehicle approached and the agents pulled in behind it. As a result of the ensuing immigration stop, five passengers were discovered in the Blazer: a male driver and a female passenger (the defendant) in the front seat, both with documents permitting them to be in the U.S., and a U.S. citizen child and two undocumented aliens in the back. Additional evidence obtained as a result of the stop includes the statements of the two undocumented aliens, the statement of the defendant, $1,900 in cash, and two Western Union transfer receipts, made out to the defendant as the recipient.

On cross examination, the defendant established that the agents did not have any information regarding the identity of the caller, the location of the caller, or any facts indicating that the caller was truthful, honest or believable.[1] Although the caller identified the individuals who were picked up as "suspected aliens," the caller did not provide any details underlying this conclusion, such as style of dress, whether

---

1. No evidence was presented as to whether or not an audio recording of the anonymous cell phone call exists, nor as to whether the dispatcher had recorded the cell phone number, through the use of "Caller ID."

the individuals were wet or appeared dirty, or whether they were speaking Spanish or English. Finally, the anonymous caller did not say whether the Blazer picked up the aliens on the north or south side of the checkpoint.[2]

### THE DEFENDANT'S FOURTH AMENDMENT STANDING

■ As an initial matter, the government argues that the defendant lacks standing to challenge the constitutionality of the stop. During the hearing, defense counsel, without presenting supporting evidence, stated that the parties had agreed prior to the hearing that the defendant did have standing, because she was a passenger in her father's van, using it with his permission. However, the government replied that it had only agreed to waive the standing issue if the defendant presented evidence of her authorization to use the vehicle to the court. Because no evidence was presented on this point, the defendant's standing remains in dispute between the parties.

An inquiry into standing "requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Rakas v. Illinois*, 439 U.S. 128, 140, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). The interest at stake in brief detentions such as this one has been described by the Supreme Court as "the right to personal security free from arbitrary interference by law officers." *Terry v. Ohio*, 392 U.S. 1, 20–21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Stopping a car and detaining its occupants constitutes a seizure within the meaning of the Fourth Amendment. *United States v. Hensley*, 469 U.S. 221, 226, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). Standing to challenge a seizure resulting from a brief immigration stop should be distinguished from standing to challenge the search of a vehicle. *United States v. Roberson*, 6 F.3d 1088, 1091 (5th Cir.1993); *United States v. Shareef*, 100 F.3d 1491, 1499–1500 (10th Cir.1996). While a defendant must show that he or she has a reasonable expectation of privacy in the area searched to challenge a vehicle search, the interest at stake in an immigration stop is the defendant's interest in being free from an unreasonable seizure of his or her person. *Roberson*, 6 F.3d at 1091.

In this case, when Agents Prejean and Perez stopped the Blazer, they seized the driver, the defendant, and other passengers in the vehicle within the meaning of the Fourth Amendment. *Id.* By challenging the agents' stop, the defendant has raised a claim that stems from her interest in being free from the unreasonable seizure of her person in an immigration stop. Therefore, it is found that the defendant has standing to raise the constitutionality of the stop of the vehicle within which she was a passenger.

### LEGAL STANDARD FOR ROVING BORDER PATROL STOPS

■ The standard for determining whether a brief stop by the roving Border Patrol violates the Fourth Amendment is set out in *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). "[O]fficers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Id.* at 884, 95 S.Ct. 2574. The courts have identified a non-exclusive list of factors to be considered under this test: the area's proximity to the border, characteristics of the area, the officer's previous experience with alien trafficking,

2. Additionally, no evidence was presented regarding whether the checkpoint outside of Eagle Pass was open or closed at the time of the stop. If the checkpoint had been open and the caller had stated that the pick-up occurred north of the checkpoint, the inference that the individuals picked up were aliens attempting to avoid detection by the checkpoint would be stronger.

the usual patterns of traffic on the road, information about recent illegal border crossings, the driver's behavior, aspects of the vehicle itself, and the number, appearance, and behavior of the passengers. *United States v. Aldaco,* 168 F.3d 148, 150 (5th Cir.1999); *United States v. Casteneda,* 951 F.2d 44, 47 (5th Cir.1992). Determining whether or not reasonable suspicion exists in a specific case is a fact-intensive inquiry, and "the totality of the circumstances" must be examined in each case. *Aldaco,* 168 F.3d at 150 (citing *United States v. Villalobos,* 161 F.3d 285, 288 (5th Cir.1998)).

■ Whether a tip provides a sufficient basis for an investigatory stop may depend upon the credibility and reliability of the informant, the specificity of the information contained in the tip, the extent to which the information in the tip can be verified by the agents in the field, and whether the tip concerns recent activity, or has gone stale. *United States v. Gonzalez,* 190 F.3d 668, 672 (5th Cir.1999) (citing *Alabama v. White,* 496 U.S. 325, 328–32, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)). As the Supreme Court held in *Alabama v. White,* a tip from an anonymous informant on its own, suitably corroborated, may be sufficiently reliable to provide reasonable suspicion to make an investigatory stop. 496 U.S. at 327, 110 S.Ct. 2412. However, as the Court made clear, "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *Id.* at 329, 110 S.Ct. 2412. As the Supreme Court recently clarified, the anonymous tip at issue in *White* was found to be reliable because the police were able to observe that the informant was correct in predicting the actions of the suspect, thereby making it reasonable for the police to assume that the tipster also had inside knowledge about concealed criminal activi-

ty. *Florida v. J.L.,* —— U.S. ——, —— ——, 120 S.Ct. 1375, 1378–1379, 146 L.Ed.2d 254 (2000) (construing *White,* 496 U.S. at 332, 110 S.Ct. 2412). The Court in *Florida v. J.L.* held that an anonymous tip "that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun" could not establish reasonable suspicion, because the credibility and reliability of the anonymous informant could not be confirmed with only accurately recounted non-predictive details that are readily observable by the public. *Id.* at 1378–1379. The tip in *J.L.* effectively identified the subject of the tip but provided no information that could not be known to anyone who observed the subject in public. Finally, the reasonableness of the officers' suspicion may only be measured by what the officers knew before they initiated the stop, and cannot be confirmed by the discovery of contraband that resulted from the stop. *Id.* at 1379.

### ANALYSIS

■ In this case, the agents made the decision to stop the vehicle in which the defendant was a passenger upon information provided by the anonymous caller, and not based upon their own observations of suspicious activity. The caller's information, which was acted upon promptly by the agents, included an accurate description of a particular vehicle suspected by the caller of carrying illegal aliens.[3] The agents did not know the identity or location of the caller, nor did they have any information which would indicate the reliability of the caller, based upon past experience.[4] None of the caller's information was predictive; that is, the caller did not provide any details regarding the future behavior of the vehicle or its passengers. The agents' independent investigation cor-

---

**3.** Agent Prejean testified that this tip was about the best tip he had ever received, except that it lacked the license plate number.

**4.** These facts distinguish the instant case from Border Patrol stops relying upon informants who had previously provided information to the government, or who did not conceal their identity, *e.g. United States v. Lopez–Gonzalez,* 916 F.2d 1011, 1014 (5th Cir.1990), *United States v. Diaz–Borjas,* No. 98–2249, 1999 WL 542579 (10th Cir.1999).

roborated only the description of the vehicle. As the Supreme Court held in *Florida v. J.L.*, corroboration of non-predictive information can not be used to confirm the reliability of an anonymous informant for the purpose of establishing reasonable suspicion of criminal activity. —— U.S. at ——, 120 S.Ct. at 1379. Therefore, without corroboration of predictive information or the independent observation by agents of suspicious activity, the anonymous caller's information is not sufficiently reliable to justify the intrusion of an immigration stop.

Additionally, even if there were some evidence tending to establish the caller's general reliability, the caller's observation that the individuals involved were "suspected illegal aliens" is completely unsubstantiated. The caller failed to provide a basis for this conclusion, other than the fact that the vehicle made the pick-up near a checkpoint.[5] It is not reasonable to assume, as the government suggests, that the caller was a resident of the border and possessed some special expertise in identifying aliens. Nothing is known about the caller, and it cannot be presumed that the caller based his or her conclusion on his or her experience living on the border, or anything else in particular. Unlike the identifiability of the gun in *J.L.*, an individual's immigration status is not easily discerned through observation. For these reasons, it is found that the tip in this case is even less reliable than the tip in *J.L.* Even if the caller's tip had contained some indicia of reliability, it is found that the agents would not have been justified in stopping the vehicle in which the defendant was traveling based upon such limited information.

Under *Brignoni–Ponce*, factors other than an informant's tip may add up to reasonable suspicion. In this case, the agents did not develop information regarding the other *Brignoni–Ponce* factors. It is found that the stop at issue did occur in physical proximity to the border, since the stop took place approximately 20 miles outside of the city of Eagle Pass, Texas, and the vehicle was headed north, away from the border, at the time it was stopped.[6] However, the proximity of the stop to the border cannot make up for the agents' lack of any other support for their suspicion. Proximity to the border is a paramount factor in determining reasonable suspicion under *Brignoni–Ponce*. *Zapata–Ibarra*, 2000 WL 650017, at *2. However, the citizenry of the border region do not reside "within a deconstitutionalized zone." *United States v. Lopez–Valdez*, 178 F.3d 282, 286 (5th Cir.1999) (citing *United States v. Newell*, 506 F.2d 401, 405 (5th Cir.1975)). The proximity of the vehicle to the border can not make an unsubstantiated tip reliable, and in this case, the officers made no independent observations of suspicious activity that would contribute to the reasonableness of their suspicion. Therefore, even considering the stop's proximity to the border, the agents lacked reasonable suspicion to conduct an immigration stop.

**5.** Although the fact that the pick-up occurred near a checkpoint does add to the likelihood that the vehicle was engaged in alien smuggling, the caller did not specify on which side of the checkpoint the pick-up occurred. If the pick-up occurred south of the checkpoint, the location of the pick-up would not tend to support the conclusion that the new passengers were attempting to evade the checkpoint.

**6.** It is noted that Eagle Pass is a border city. *See United States v. Cardona*, 955 F.2d 976, 980, n. 10 (5th Cir.1992). The determination of whether an arresting agent could reasonably conclude that a particular vehicle originated its journey at or near the border is often made based upon the distance of the stop from the border, the number of towns along the road, and the number of intersecting roads. *See United States v. Inocencio*, 40 F.3d 716, 722 (5th Cir.1994). The parties did not present detailed evidence on this point. However, because the stop in this case occurred approximately 20 miles from a border city and the vehicle was traveling away from the border, it is found that it was reasonable to consider it likely that the vehicle's journey originated at the border. *See United States v. Zapata–Ibarra*, 212 F.3d 877, 880 (5th Cir. 2000).

Taking into consideration the forgoing reasons, the defendant's motion to suppress shall be and is hereby,

**GRANTED.** It is therefore,

**ORDERED** that all statements and evidence seized by the government as a result of the stop in issue, performed by Agents Prejean and Perez on March 13, 2000, be suppressed.