UNITED STATES of America

v.

**Adelina Anita ORDONEZ AKA: Adelina Anita Contreras AKA: Adelina Ordenez, Defendant.**

No. CR.A.B–02–563–2.

United States District Court, S.D. Texas, Brownsville Division.

Feb. 4, 2003.

Mr. Angel Castro, Assistant United States Attorney, Brownsville, TX, for Petitioner.

Mr. John T. Blaylock, Blaylock Law Office, Brownsville, TX, for Respondent.

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

HANEN, District Judge.

### I. INTRODUCTION

Adelina Anita Ordonez was indicted for possession with intent to distribute a quantity exceeding fifty kilograms of marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1) & 841(b)(1)(C). This marijuana was found in the gas tank of the vehicle in which she was a passenger at the time of the traffic stop leading to the instant arrest and prosecution. Ordonez moved to suppress this evidence, claiming that the marijuana seizure was the fruit of an illegal detention. Following an evidentiary hearing on this issue, the court requested the parties to produce the videotape recording of the traffic stop or object to the court's review of same. This tape was provided by the parties and reviewed by the court without objection. Having reviewed all of the evidence, this court now denies the motion to suppress because the stop was justified and the length of the detention was not excessive.

### II. BACKGROUND

Texas Department of Public Safety Officer Sergio Ramirez stopped the vehicle in which Ordonez was riding as a passenger for following another vehicle too closely in violation of Texas Transportation Code § 545.062 approximately five miles north of Raymondville, TX, on State Highway 77. The vehicle was driven by Roberto Galvan. Officer Ramirez ordered Galvan to exit his truck and explained the reason for the

stop.[1] Officer Ramirez asked for and received Galvan's driver's license. Ramirez then asked Galvan routine questions concerning the origin and destination of his trip, his relationship with the passenger and defendant in this case, his employment, and his ownership of the vehicle. Galvan could not remember Ordonez's name despite telling the officer that he had known her for about five months and that they had been in the Rio Grande Valley visiting his relatives for the past three days. Officer Ramirez then questioned Ordonez, who could not tell the officer Galvan's last name and gave conflicting descriptions of their trip. Specifically, Galvan told the officer that they had stayed with his uncle in Brownsville, and that they had been in the Valley for three days, while Ordonez stated that they had stayed with Galvan's uncle in Raymondville and in hotels, and that they had been in the Valley for five days. Ordonez offered her birth certificate as identification, explaining that she had no photo ID because her wallet had been stolen at a Denny's restaurant during the trip. Officer Ramirez then resumed questioning Galvan, who, having apparently heard the conversation between Ordonez and Ramirez, modified his story to substantially comply with that of Ordonez, claiming that he had uncles in both Raymondville and Brownsville, but that they had only stayed with the uncle in Raymondville. During this round of questioning he stated that they had been in the Valley for seven days, and that he had only known Ordonez for two to three months. He still could not remember Ordonez's name.

After the end of this additional questioning, Officer Ramirez began to issue Galvan a warning for following too closely. He copied certain information from Galvan's license, then asked for and obtained Galvan's signature on the warning. While Ramirez was writing the warning he asked Galvan if he were carrying any guns or other contraband. Galvan responded that he was not. Officer Ramirez then asked if he could search the truck. Galvan immediately consented. Ramirez handed Galvan a copy of the warning and produced and explained a consent form for the search which Galvan signed. Officer Ramirez then gave Galvan several documents which appeared to be Galvan's copy of the consent form and his driver's license. Approximately eleven minutes transpired between the initial stop and Galvan's written consent.

Officer Ramirez thoroughly searched the truck inside and out. He testified that he noticed that the gas tank bolts had been removed, and also detected the smell of new paint or "bondo," an automotive adhesive, underneath the vehicle. He then looked inside the gas tank with a fiberoptic scope and saw two large metal containers therein. Officer Ramirez asked Galvan to follow him to the Willacy County Sheriff's Office to conduct a further search of the car and these containers, which were ultimately found to contain the marijuana Ordonez is now charged with possessing with intent to distribute.

## III. DISCUSSION

The government initially contended that Ordonez could not challenge Officer Ramirez's search because she had no possessory interest in Galvan's truck, *see Rakas v. Illinois,* 439 U.S. 128, 148–49, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *United States v. Roberson,* 6 F.3d 1088, 1091 (5th Cir. 1993); *United States v. Mendoza–Burciaga,* 981 F.2d 192, 196 (5th Cir.1992); *Unit-*

---

**1.** The interactions between Officer Ramirez, Galvan, and Ordonez were recorded by the DPS camera contained in Ramirez's patrol car. The video and sound quality of the resulting videotape recording were quite good.

*ed States v. Strmel,* 744 F.2d 1086, 1088 (5th Cir.1984), but subsequently conceded that passengers can challenge vehicle stops even if they do not own the stopped vehicle, *Whren v. United States,* 517 U.S. 806, 808–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *Jackson v. Vannoy,* 49 F.3d 175, 176 (5th Cir.1995); *Roberson,* 6 F.3d at 1091, and, if successful, can have the fruits of that unlawful stop excluded. *See Roberson,* 6 F.3d at 1091–92.

The government next argued that if the stop was valid, Ordonez may not challenge the resulting search. *Terry v. Ohio,* however, requires not only that the officer's action be justified at its inception, but also that the scope of the search or seizure be reasonably related to the circumstances justifying the initial detention. 392 U.S. 1, 19–20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *see also United States v. Dortch,* 199 F.3d 193, 198 (5th Cir.1999); *United States v. Shabazz,* 993 F.2d 431, 435 (5th Cir.1993); *United States v. Kelley,* 981 F.2d 1464, 1467 (5th Cir.1993). Thus, even though the initial stop was valid, Ordonez will still prevail unless the government can also show either 1) that the detention did not improperly extend beyond its initial justification or 2) that Officer Ramirez obtained additional reasonable suspicion justifying continued detention during the initial investigation. *See United States v. Santiago,* 310 F.3d 336, 341 (5th Cir.2002) (collecting cases and holding that once the original suspicions justifying the stop have been verified or dispelled, detention must end unless the officer has obtained additional reasonable suspicion during the initial investigation).

**A. The initial stop was valid.**

■ At the hearing, the government and defendant primarily disputed the first *Terry* prong, the legality of the initial stop. Officer Ramirez testified that the Galvan's car was traveling fewer than two car lengths behind another truck, that both vehicles were traveling near the speed limit, and that this was an unsafe driving distance for highway travel. Ordonez testified that Galvan was following a car, not a truck, and that there was enough room for a third car to move in between the two vehicles, though she could not say if the distance between Galvan's truck and vehicle ahead was greater than two car lengths. Ordonez also argued that Ramirez's stop was merely pretextual, and that he was simply searching for drugs without any reasonable basis to believe any would be found in Galvan's truck. The videotape of the stop does not begin until both cars have slowed almost to a halt on the shoulder of the highway. Thus, resolution of this issue is basically a credibility determination. This court finds that Officer Ramirez is the more credible witness and that he had a reasonable basis to stop Galvan's truck for following too closely. *See Dortch,* 199 F.3d at 195, 197 (noting that Dortch could not seriously contest the legality of the initial stop for following too closely). This court further notes that pretextual stop claims have been consistently rejected for fifteen years in this circuit. *E.g., United States v. Causey,* 834 F.2d 1179, 1184 (5th Cir.1987) (rejecting pretext challenge by noting that "so long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry").

**B. The detention following the stop was not excessive.**

■ The second *Terry* prong—whether the detention was reasonably related to its initial justification—presents more difficult factual and legal questions that the parties largely ignored in both their briefing and at the suppression hearing. As explained below, this court concludes that the detention in this case was not excessive because Officer Ramirez obtained Galvan's valid

consent to search the truck before he finished issuing the written warning for following too closely. *See Kelley,* 981 F.2d at 1470 & n. 5 (holding that driver's consent precluded passenger's objection to search, and noting that defendants must "suffer the consequences of their companions' consent").

After Officer Ramirez stopped Galvan's vehicle, he briefly questioned the driver and passenger concerning their identities and relationship to each other, their destination, the purpose of their trip, and the ownership of the vehicle. All of these questions fell within the scope of a routine traffic stop. *See United States v. Machuca–Barrera,* 261 F.3d 425, 433 (5th Cir. 2001) (holding that court does not usually scrutinize particular questions so long as they tend to relate to the purpose of the stop); *Roberson,* 6 F.3d at 1092–93 & n. 15 (noting that questioning on matters such as ownership of the vehicle is within the scope of a routine traffic stop); *see also United States v. Lyton,* 161 F.3d 1168, 1170–71 (8th Cir.1998) (noting that officer

may ask questions reasonably related to stop, including questions relating to presence in the area, destination, and purpose). Further, Ramirez's interactions with Galvan and Ordonez were brief, efficient, and polite; he completed this initial questioning within seven minutes of the stop. Thus, the scope and duration of this questioning would not cause a reasonable person to perceive any undue restraint upon her liberty. *See Roberson,* 6 F.3d at 1092.

While Officer Ramirez was obtaining Galvan's signature on the warning, Ramirez twice asked him if he was carrying any contraband or weapons. Galvan said no. Next, as Ramirez was separating the original and carbon copy of the warning, he asked Galvan for permission to search the truck. Galvan immediately and unhesitatingly consented. Galvan then received his copy of the warning and signed a consent form authorizing the search.[2] Fifth Circuit precedent makes clear that Ramirez could not have had any reasonable suspicion that Galvan was carrying contraband based on the facts of this case.[3] *See*

**2.** Officer Ramirez testified to a different sequence of events. Specifically, he indicated that he did not ask for consent to search until after issuing the warning. Were this the case, this court's analysis might be quite different. However, the videotape clearly indicates that Ramirez asked for and obtained Galvan's consent before he finished processing and issuing the warning.

**3.** This court's ruling that Officer Ramirez did not have "additional reasonable suspicion" is based solely on its duty to follow Fifth Circuit precedent. When one reviews the videotape, it is clear that no reasonable person in Officer Ramirez's position could *not* have had "additional suspicion" that criminal activity was afoot based on Galvan and Ordonez's conflicting, limited answers to Officer Ramirez's most basic questions. The Fifth Circuit's rule in this regard is presumably based, at least in part, on its concern that certain law enforcement officers could easily fabricate such inconsistencies and gaps to justify unwarranted intrusions on motorists' liberty and privacy

interests, *cf. Roberson,* 6 F.3d at 1092 (noting that the court had "become familiar with [a certain officer's] propensity for patrolling the fourth amendment's outer frontier" where that officer had a "remarkable record" for warrantless drug arrests following traffic stops), or that certain officers' use of intimidating or coercive tactics might induce inconsistent—and therefore "suspicious"—answers caused by the suspects' anxiety and fear rather than any effort to hide the truth. *Cf. Dortch,* 199 F.3d at 198 (noting that detention did not become voluntary when "the officer asked Dortch whether he wanted to stick around while the dogs completed their search," where the court found it "unlikely ... that he would feel free to walk off down the highway, particularly given the fact that the officers still held his license and that Dortch was in an unfamiliar, relatively deserted area, miles from the nearest town, in the middle of the night"). Nonetheless, broad adoption of video-recording may eventually give this Circuit reason to reconsider its strict interpretation of the "additional reasonable

*Santiago*, 310 F.3d at 337–39, 342 (holding that officer had no reasonable suspicion of trafficking to justify continued detention after computer check came back negative even though driver and passenger provided contradictory statements, did not have the same last name despite claiming to be married, and driver could not initially remember passenger's name and appeared extremely nervous); *Dortch*, 199 F.3d at 199–200 (holding that officers had no reasonable suspicion of trafficking to justify continued detention after computer check came back negative despite conflicting stories from driver and passenger and the fact that neither were listed as authorized drivers of rental car). Thus, Officer Ramirez did not acquire "additional" reasonable suspicion to extend the duration of the stop beyond its initial justification. *See Santiago*, 310 F.3d at 341.

■ However, "a police officer's questioning, even on a subject unrelated to the purpose of the stop, is itself [not] a Fourth Amendment violation," *Shabazz*, 993 F.2d at 436, and Officer Ramirez's questions concerning contraband and his request to search Galvan's truck did not extend the involuntary portion of the detention at all. *See id.* at 437 (holding that questioning during pendency of computer checks could not violate defendant's Fourth Amendment rights because the questioning did not extend the duration of the initial, valid seizure). Both the questions concerning contraband and the request to search occurred while Officer Ramirez was processing and issuing the warning. Further, Galvan orally consented to the search before receiving his warning for following too closely.[4] Thus, Galvan's consent was requested and obtained before the initial justification for the stop had concluded. *Cf. Santiago*, 310 F.3d at 341 ("During a traffic stop, an officer can request a driver's license . . .; he or she may also run a computer check and issue a citation.").

Had Ramirez handed Galvan the warning and only at that point begun asking questions concerning contraband and requesting permission to perform a search, this court might conclude that the detention was excessive, because these additional questions and request probably would have amounted to prolonging the detention beyond its original justification.[5] The legality of the stop thus appears to turn on the somewhat fortuitous event of when a piece of paper exchanges hands. Indeed,

suspicion" requirement, especially in cases such as this one where there can be little question as to exactly what transpired. *E.g., United States v. Zubia–Melendez*, 263 F.3d 1155, 1161–62 (10th Cir.2001) (Ebel, J.) (noting that patrol car was equipped with videorecorder, and holding that officer obtained additional reasonable suspicion that occupants might be engaged in criminal activity based on occupants' "dubious and inconsistent" answers to officer's questions; specifically, occupants did not know each others' names despite claiming to be related by marriage, and gave inconsistent answers as to their whereabouts the night before the stop).

4. Specifically, Ramirez asked Galvan, "Do you mind if I search your truck," to which Galvan responded, "go ahead."

5. Officers may, of course, request and obtain consent to search a vehicle *after* a valid detention has concluded. *See United States v. Brown*, 102 F.3d 1390, 1394–96 (5th Cir. 1996) (affirming denials of motions to suppress where owner gave consent to search after stop had concluded and vehicle was free to go). But in this case, the detention had not concluded at the time Officer Ramirez asked for Galvan's consent; Ramirez had not yet issued the warning to Galvan, and more important, Ramirez still possessed Galvan's driver's license. *See Dortch*, 199 F.3d at 198 (noting that Dortch "did not feel free to leave . . . because the officers still held his license and rental papers and had told him they were going to detain his car until the dog team arrived"). Thus, the issue in this case is whether the detention was unreasonably prolonged by asking for Galvan's consent.

the Fifth Circuit recognized this possibility in *Dortch:*

> Thus, to say that the search was unconstitutional because it was during an unlawful detention makes that determination turn on the fact that the search occurred moments after the computer check was completed, rather than moments before. But it is well established that an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.

199 F.3d at 200 (internal citation omitted). Following this reasoning, Ramirez's request for consent and the resulting search in this case are valid because the request came in just under the wire, moments before Ramirez completed issuing the warning to Galvan. Alternatively, the detention was not excessive in this case because Ramirez's questions and request to search did not unduly delay the conclusion of the detention. Had Ramirez delayed processing the warning to ask Galvan extensive questions unrelated to the scope of the initial stop, the detention might have been considered excessive regardless of whether Galvan gave his permission to stop before or after Ramirez handed him his copy of the warning.

### C. Galvan's consent was voluntary.

 Finally, Ordonez argues that Galvan's consent was involuntary.[6] To be valid, a consent must be "free and voluntary." *Kelley,* 981 F.2d at 1470 (citation omitted). The burden to prove voluntariness lies with the government. *Id.* (citation omitted). While voluntariness is "a question of fact to be determined from the totality of all the circumstances," *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the Fifth Circuit has often mentioned six specific factors as relevant to this determination:

> (1) the voluntariness of the defendant's custodial status; 2) the presence of coercive police procedures; 3) the extent and level of the defendant's cooperation with police; 4) the defendant's awareness of his right to refuse consent; 5) the defendant's education and intelligence; and 6) the defendant's belief that no incriminating evidence will be found.

*United States v. Olivier–Becerril,* 861 F.2d 424, 425 (5th Cir.1988) (citations omitted). No one of these factors is dispositive or controlling. *Id.*

When Officer Ramirez asked for Galvan's consent to search the vehicle, he had not yet issued the warning, and more important, he had not returned Galvan's license. In fact, although he handed Galvan a copy of the warning immediately after obtaining Galvan's oral consent to search the truck, he did not return Galvan's license until after he had also obtained Galvan's written consent. He also did not tell Galvan he was free to leave prior to obtaining his consent. Thus, Galvan could and probably did reasonably believe he was under still detention at the time he gave his consent.[7] The evidence also suggests that Galvan is not well-educated. When Officer Ramirez asked if Galvan could read and write English, Galvan responded, "No very good." Thus, the first

---

6. There may be some question whether Ordonez can complain that Galvan's consent to search the car was involuntary. *Compare Kelley,* 981 F.2d at 1470–72 (addressing defendant's claim that owner's consent was involuntary) *with Brown,* 102 F.3d at 1395 n. 3 (stating in dicta that passenger had standing to challenge stop but did not have standing to challenge subsequent search of vehicle). Because this court concludes that Galvan's consent was voluntary, it need not reach this issue.

7. Galvan did not testify at the suppression hearing.

and fifth factors point in favor of finding that Galvan's consent was involuntary.

■ However, each of the remaining factors favors the government. First, there is a complete absence of coercive procedures in this case, and Galvan could hardly have been more cooperative with Ramirez. Officer Ramirez was unfailingly polite and friendly throughout the detention. Indeed, Ramirez and Galvan chatted amiably about various unrelated topics such as Galvan's work and wages and the police radio speaker at the front of Ramirez's vehicle. At no point did Ramirez attempt to intimidate Galvan or bully him into making any incriminating statements or consenting to a search.[8] Far from employing coercive procedures, Ramirez seemed to intentionally avoid such techniques to set Galvan at ease. For his part, Galvan never attempted to resist any of Ramirez's directives or refuse to answer his questions. Rather, he seemed to be trying to avoid suspicion by being as cooperative as possible. Thus, each of these factors strongly favors a finding of voluntariness.

Galvan's awareness of his right to refuse consent also favors the government, though somewhat less strongly. Ramirez asked if Galvan would mind if he searched his truck, to which Galvan immediately and unhesitatingly responded, "go ahead." Ramirez produced a search form and explained that he was "asking [Galvan] for permission to take a look," and asked him to sign the form if he "[didn't] have a problem" with providing this permission. Ramirez repeated these phrases while Galvan was looking at the form. Galvan then signed the form. Approximately 35 seconds elapsed between Ramirez's first mention of the form and Galvan's signature, during which Ramirez was talking the entire time. Given Galvan's admittedly poor English reading skills and limited education generally, there is little chance that he could have read this form in that short span of time while also listening to Ramirez and responding to his questions. However, Ramirez's description of the form's contents was admirably honest, and clearly implied that Galvan could refuse to consent to the search without expressly using those words.

Finally, it is reasonable to assume that Galvan thought no incriminating evidence would be found. In fact, Galvan's extreme level of cooperation combined with the location of the marijuana basically permits no other reasonable inference. The marijuana was in containers hidden in the truck's gas tank. Without a fiber-optic scope or a drug-sniffing dog, Ramirez would not have been able to see these containers or otherwise detect the contraband. Galvan knew that Ramirez did not have a drug-sniffing dog in his patrol car, and may have thought a dog could not detect contraband in metal containers surrounded by gasoline in any event. Further, Galvan could have reasonably believed the chances would be quite slim that a state trooper would possess a fiberoptic scope to look in his gas tank. Of course, Galvan did not testify to any of this at the hearing (because he did not testify at all), so this court does not weigh this factor as

8. This is especially notable given that Ordonez and Galvan gave inconsistent answers to basic questions about their trip and each could not tell Ramirez much about the other. Galvan could not remember Ordonez's name, and Ordonez could not remember Galvan's last name, despite both telling the officer that they had known the other for several months.

Officer Ramirez could have emphasized these gaps and inconsistencies and used them to attempt to extract a confession or further incriminating statements from Galvan or Ordonez, but instead he simply asked a few follow-up questions and proceeded with the warning.

strongly in favor of the government as it might otherwise be inclined.

Nonetheless, based on the foregoing analysis, this court finds that Galvan's consent was voluntary. Having already concluded that this consent was not preceded by a *Terry* violation, this court accordingly **DENIES** Ordonez's motion to suppress.