United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 18, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 02-40719

_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

REGINALD BRIGHAM,

Defendant-Appellant.

Appeal from the United States District Court
For the Eastern District of Texas

Before JONES, WIENER, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

Defendant-appellant Reginald Brigham appeals the district court's denial of his motion to suppress codeine seized during a routine traffic stop from the rental car he was driving. He contends that the investigating officer subjected him to a prolonged detention in violation of his Fourth Amendment rights, which tainted the officer's subsequent consensual search. Because we agree that Brigham was unlawfully detained, we reverse the district court and remand for entry of judgment of acquittal.

## BACKGROUND

Shortly after 4:00 P.M., on Sunday, May 14, 2000, while turning his patrol car around on an overpass, Trooper Shannon Conklin of the Texas Department of Public Safety saw Reginald Brigham driving over a rise in the highway in the outside lane following the vehicle in front of him too closely. Conklin decided to pull over the vehicle, a late model Buick sedan, which contained three young black males, and one young black female.

He approached the car at approximately 4:13 P.M. and asked Brigham to produce his driver's license and car registration and to step out of the car and move back behind the car to an area in front of the patrol vehicle. Brigham complied and gave Conklin his driver's license and a copy of the rental agreement for the car.

Conklin testified later that while reviewing the license and rental contract, he immediately noticed that a fifty year old woman had rented the car but was not present. Standing in the ditch in front of the patrol vehicle, Brigham asked what the problem was and Conklin explained that Brigham was following too closely and Conklin thought the passenger in the front seat may not have been wearing a seatbelt. Instead of promptly requesting a computer check on the driver's license or car's papers, Conklin began to question Brigham, asking him where he was coming from and the purpose of his travel. Brigham answered that he had been in Houston on pleasure and one of the passengers had visited family in

2

Houston. Conklin continued, asking Brigham which part of Houston they had stayed in and where they had stayed. Brigham answered that he did not know which part of Houston they had stayed in and, after pausing for a moment, answered that they stayed at a La Quinta Inn. Conklin asked which part of Houston the La Quinta was located in, to which Brigham first replied that he was not sure and then said he thought it was the North Highway 59 area. Conklin then asked Brigham when he had arrived in Houston; Brigham said Friday. Conklin persisted, asking Brigham to specify what time on Friday he had arrived. Brigham responded that they had arrived Friday morning. After three to four minutes of this questioning, Conklin turned to the rental agreement and asked Brigham who had rented the car. Brigham responded that his mother, Dorothy Harris, had rented it. Conklin asked where she was; Brigham told him that she was in Arkansas.

Conklin later testified that he became suspicious because (1) the woman who rented the vehicle listed her age as 50 and thus could not have been in the car, and (2) Brigham did not share the same last name as the person who rented the car. Despite noticing the renter's age and last name, however, Conklin testified that he did not notice that (1) the address on Brigham's driver's license was the same as the address listed by Harris on the rental agreement, or (2) at 50, Harris was of an age that she could be Brigham's mother. Conklin also testified that Brigham seemed nervous, that his hands were shaking, and that he tended to answer

3

a question with a question.[1]

Continuing, Conklin asked Brigham to point out the passenger who had family in Houston, and also asked if Brigham had any weapons. Brigham appeared to indicate it was Franklin who had family in Houston; Franklin was seated in the back seat. Brigham also responded that he had no weapons. This was just after 4:17 P.M. Conklin remarked at the time that he wanted to find out in which part of Houston the friend had family. Conklin approached the car, asked Brandon Franklin to step out of vehicle and go in front of the car off the shoulder and into the grass, and requested Franklin's driver's license. The license, which turned out to be fictitious, identified Franklin as Siracrease Brooks. Conklin began to ask Franklin the same battery of questions that he had asked Brigham. Conklin first asked where they were coming from. Franklin responded that they had been in Houston and had gone to see an Isley Brothers concert. Conklin asked when they went to the concert; Franklin said Friday night. Conklin asked how long they had been in Houston, and Franklin said they had been there a couple of days. Conklin asked what day and time they had arrived. Franklin initially said Friday late afternoon or evening, but then

_____

[1] The record in this case contains a videotape of the traffic stop. Although Brigham's responses on the videotape are slightly unclear, there were only one or two instances where Brigham answered a question with a question and both instances it appeared Brigham did not understand Conklin's question or could not hear the question because of the traffic noise from the busy highway. The videotape does not clearly show nervousness.

4

stated that he was not exactly sure of their arrival time. Conklin continued by asking Franklin whether he stayed with friends or family. Franklin said they had stayed at a hotel. Conklin asked which hotel; Franklin said a La Quinta, as had Brigham. Conklin asked how often Franklin went to Houston and whether he knew anyone there. Franklin responded that he did not go there often and that he knew "a couple of girls" in Houston that he had met at a college function. Conklin never specifically questioned Franklin if he had family in Houston.

Between 4:19 and 4:20 P.M., Conklin next approached the vehicle and asked similar questions of the remaining two occupants, Quincy Perry and the young female who had no identification. Conklin asked where they were coming from, and whether the visit was for business or pleasure. Perry responded that they had been in Houston for pleasure. Conklin asked how long they had been there, and Perry said a couple of days. Conklin asked which day they had arrived, and Perry initially responded that they had arrived Friday morning, but the woman suggested that perhaps it was Saturday morning. Perry then stated that they had stayed one day and two nights. When Conklin indicated that they could not have arrived Saturday morning and stayed two nights, Perry seemed to indicate that they had left home Thursday night and arrived in Houston Friday morning.[2]

---

[2] Unfortunately, the videotape conversation between the woman and Perry is not completely clear. But after some confusion, they

Finally, at 4:21 P.M., after almost eight minutes of questioning the driver and the three passengers about matters unrelated to the traffic stop or the rental car, Conklin returned to his patrol car to radio in the personal and rental car identification information. Almost immediately, the dispatcher reported that the rental car had not been reported stolen. Then for nearly five minutes there was silence and no activity during which Brigham stood in the ditch behind the rental car, Franklin waited in the ditch in front of the rental car, the other passengers remained in the rental car, and Conklin waited in his patrol vehicle to hear back from his radio contact on the driver's licenses. While waiting, Conklin recorded orally on the videotape a message to himself that (1) as to the rental agreement, the subjects were not 25 years old nor listed on the rental agreement (Harris had rented the car), (2) the subjects seemed nervous (hands were shaking) and neither Brigham nor Franklin had made eye contact with Conklin, (3) all four appeared to lack legal standing as to the vehicle because they were not listed as authorized drivers, and (4) they had conflicting stories about arrival time in Houston and who they had visited there.

At 4:29 P.M., eight minutes after receiving radio contact from Conklin, the dispatcher reported that (1) Perry and Brigham had some criminal activity in their backgrounds, but their licenses

---

seem to indicate that they left Thursday night and arrived Friday morning in Houston.

6

were clear and criminal details were unavailable, and (2) the license Franklin offered was likely fictitious.

Then Conklin emerged from his car, and aggressively asked Brigham what Franklin's name and age was. After initially not understanding Conklin's question, Brigham responded that his first name was Brandon, and thought his full name was Brandon Franklin. Conklin then confronted Franklin. Franklin initially tried to maintain the fake identity, but then admitted that his name was Brandon Franklin. Then Conklin asked for Franklin's wallet and searched it but found nothing. Thereafter, around 4:33 P.M., Conklin called in the new identification and waived over a local Nacogdoches police car for back-up. He briefed the local police officers on the situation, and remarked that he was going to try to get consent to search but would search the vehicle anyway because none of the four had standing to protest.

After speaking to the local police, Conklin issued Brigham a written warning for driving too close, which Brigham had to sign. This was at 4:34 P.M. It is unclear from the videotape whether Conklin returned Brigham's driver's license to him, but Conklin testified at the suppression hearing that he returned the license. The record is clear that Conklin launched into his consent to search request immediately after Brigham signed the warning citation. At about 4:35 P.M., twenty-one minutes after making initial contact with Brigham, Conklin informed Brigham that one of his jobs is to patrol for contraband. He asked for consent to

7

search, which Brigham gave. Conklin proceeded to pat down all the car's passengers, told Brigham to relax and wait over in the grassy area of the ditch and told all the other passengers to step over to the grassy area and sit-down; he later asked them not to talk to each other. The local officers kept watch over Brigham and the others while Conklin searched the passenger compartment and trunk of the vehicle. In a cooler in the trunk, he opened a gallon-sized opaque plastic fruit drink container, and saw and smelled what he thought was codeine. The record indicates Conklin also found a half empty soda bottle of codeine. At 4:43 P.M., Conklin with the assistance of the local officers placed all the passengers under arrest. After conducting further smell tests on the substance, he concluded that the substance must be codeine, although later at the suppression hearing he admitted to having never actually seized codeine before.

Brigham was indicted for possession with intent to distribute codeine, a controlled substance under 21 U.S.C. §841(a)(1). He filed a motion to suppress the seized evidence, arguing that he had been unlawfully detained in violation of the Fourth Amendment. The district court held a suppression hearing, but denied the motion. Brigham entered a plea agreement and made a plea of guilty, conditioned upon his right to appeal the denial of his motion to suppress, which was approved by the court. He was sentenced to two months' imprisonment and one year of supervised release. He timely appealed.

## DISCUSSION

### Standard of Review

When addressing denials of motions to suppress, we review the district court's factual findings for clear error, and its "ultimate conclusions on Fourth Amendment issues drawn from those facts de novo." United States v. Santiago, 310 F.3d 336, 340 (5th Cir. 2002) (citation omitted). We also review the evidence introduced at the suppression hearing in the light most favorable to the prevailing party. Id. (citation omitted).

### Standing

This appeal focuses on whether Brigham was unlawfully detained during the traffic stop. Brigham has standing to contest this seizure of his person. United States v. Dortch, 199 F.3d 193, 198 (5th Cir. 1999).

### Reasonableness of the Detention

Brigham argues that Conklin's seven to eight minutes of questioning before beginning a computer check violated his Fourth Amendment rights, because this initial questioning had nothing to do with either the original reason for the stop (following too closely), or any subsequent suspicions about whether the rental car was stolen. Thus, the detention unreasonably extended the duration of the traffic stop, and was not the least intrusive means of resolving concerns about the rental contract. Brigham also contends that Conklin unreasonably detained him after the computer

9

check on his drivers license and the rental car had come back clean and he had signed the warning citation. Brigham argues that the computer check as to the car and his license was finished, and thus his detention beyond that point was unreasonable.

In response, the government argues that Conklin's questioning was a reasonable and minimally intrusive attempt to ascertain why Brigham was driving a car not rented in his name. The government contends that once Conklin confronted inconsistencies in the stories of the car's occupants, he had an additional reason to continue the detention. Furthermore, the government argues, the sequence in which Conklin conducted his investigation, questioning first and computer check second, instead of questioning during the computer check, is immaterial because Conklin would have discovered Franklin's false identification regardless, thereby giving the officer reason to continue the detention. Finally, the government points out that Conklin asked for consent to search the vehicle before this additional computer check on Franklin was even completed.

Our decisions have consistently relied on Terry v. Ohio to establish a two prong test that governs the permissible scope of a traffic stop. 392 U.S. 1 (1968). The reasonableness of the detention depends on (1) "whether the officer's action was justified at its inception," and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Dortch, 199 F.3d at 198

10

(citation and internal quotation marks omitted).  In this case, the validity of the initial stop for driving too closely behind another vehicle is not contested on appeal.

In applying the second prong of Terry, we have consistently recognized that "'an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'"  Id. at 200 (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)).   The Supreme Court has further explained that "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."  Florida v. Royer, 460 U.S. 491, 500 (1983) (citations omitted).   Nonetheless, the Supreme Court has counseled that such least intrusive means must be balanced against the law enforcement purposes of the stop and "the time reasonably needed to effectuate those purposes."  United States v. Sharpe, 470 U.S. 675, 685 (1985) (citations omitted). Finally, when evaluating whether there was reasonable suspicion sufficient to justify an extended detention, we "look at the totality of the circumstances and consider the collective knowledge and experience of the officers involved."  United States v. Jones, 234 F.3d 234, 241 (5th Cir. 2000) (citing United States v. Holloway, 962 F.2d 451, 459 & n.22 (5th Cir. 1992)).

The primary law enforcement purposes for making a traffic stop of a moving vehicle on a public highway are: (1) to verify that a violation of the traffic laws has occurred or is occurring and, (2)

11

to provide for the issuance of an appropriate ticket or citation charging such traffic violation or make an arrest of the driver based upon such violation.  In furtherance of these purposes, the police officer is authorized to require the driver of the vehicle to produce a valid driver's license and documentation establishing the ownership of the vehicle and that required public liability insurance coverages are in effect on such vehicle.  During the process of such a traffic stop, the police officer making the stop may and should use his senses of sight, smell and hearing to observe any other conduct or activity which might constitute a violation of any other criminal statute, but the officer must be able to articulate the specific facts and circumstances which prompt him to be suspicious of other criminal conduct before he initiates any actions to investigate such other conduct.

On more than one occasion in recent years, we have had the opportunity to evaluate traffic stops in which the car is rented and the driver is not listed on the rental agreement.  From these cases it is clear that any detention beyond the completion of a computer check is unlawful unless there is additional "reasonable suspicion supported by articulable facts that a crime has been or is being committed."  Santiago, 310 F.3d at 342 (citations omitted).

It is established that when a valid traffic stop occurs, the officer may run a computer check on the driver's license and registration or rental car papers.  Dortch, 199 F.3d at 198; United

States v. Shabazz, 993 F.2d 431, 437 (5th Cir. 1993). Furthermore, in Shabazz, we permitted questioning, even if unrelated to the purpose of the stop, that took place while the officers were waiting for the results of the computer check, because such questioning did not prolong the time of the initial valid seizure. 993 F.2d at 436-37. In United States v. Dortch, however, we concluded that once the computer check is completed and there is no warrant for arrest of the driver or report that the car was stolen, reasonable suspicion of auto theft vanishes and any further detention becomes an unlawful seizure. 199 F.3d at 199. Similarly, in United States v. Jones, we concluded that the additional three minutes of prolonged detention after the computer check came back clean violated the Fourth Amendment. 234 F.3d at 241. Finally, in United States v. Santiago, we reiterated our position that once an officer has completed his computer check and it comes back negative, thereby dispelling the suspicion that justified the check, any additional detention is unreasonable. 310 F.3d at 342.[3]

---

[3] Although Judge Jones in her dissent suggests that the Dortch, Jones, and Santiago line of cases was incorrectly decided, this Circuit has not agreed with her assessment. In neither Dortch nor Jones was there even a call for a vote to rehear the case *en banc*. In Santiago the mandate was held and a poll for *en banc* reconsideration was taken, but a majority of the active judges of this Circuit voted not to rehear the case and on March 20, 2003, a denial of rehearing *en banc* was issued. Therefore, our reliance on these cases as the law of this Circuit concerning the reasonableness of a traffic stop is not only appropriate but required.

As the government has been quick to highlight, the facts of this case differ from those of <u>Dortch</u>, <u>Jones</u> and <u>Santiago</u> as to the timing of the computer check. In <u>Dortch</u>, two highway patrol officers stopped Cecil Dortch for driving too closely to a tractor trailer. 199 F.3d at 195. The officers discovered that the car was rented and that Dortch was not listed as an authorized driver. <u>Id.</u> One officer immediately took Dortch's driver's license and rental contract to perform a computer check, while the other officer questioned Dortch and the passenger about their business. <u>Id.</u> at 196. They gave inconsistent answers about Dortch's relationship to the vehicle's renter, and stated that they had been in Houston for two days although the rental agreement indicated that the car had been rented in Pensacola, Florida the day before. <u>Id.</u> After the computer check came back clean, the officers continued to detain and question Dortch until a canine search unit arrived. <u>Id.</u> Even though the officers eventually discovered drugs on Dortch's person, we ultimately held that this detention violated the Fourth Amendment.

In <u>Jones</u>, two police officers pulled over Jones and Daniel for speeding. 234 F.3d at 237. Like <u>Dortch</u>, Daniel was driving a rental car rented by a third person, and Daniel was not listed as an authorized driver. <u>Id.</u> The officers questioned Jones and Daniel extensively about their business. <u>Id.</u> at 237-38. The officers first took Daniel to the patrol car, ran a computer check on his criminal history, and continued questioning him about the

14

nature of the trip. Id. The second officer then approached Jones to question him about Daniel's business dealings, and requested Jones's license to do a similar computer check. Id. at 238. After a few minutes, the dispatcher reported that neither Jones nor Daniel had a criminal history. Id. Notwithstanding this information, one officer continued to question Jones when returning his driver's license, and then asked Daniel for consent to search the vehicle, without having returned the rental agreement or his license to him. Id. Even though the request to search occurred only three minutes after the negative computer check was completed, we still held the prolonged detention to be unlawful.

Finally, in Santiago, the officer pulled over Santiago because he noticed a flashing light in Santiago's windshield. 310 F.3d at 337. Once the officer stopped the car, he noticed that it was a trinket hanging from the rear view mirror. Id. at 337-38. The officer asked Santiago to exit the car, and proceeded to question him about the nature of his trip and the identity of the woman in the passenger seat. Id. at 338. The officer then approached the vehicle and asked the woman for her driver's license and the car's registration, which Santiago had said was in the car. Id. The trooper returned to Santiago with the woman's license, but without the registration, which Santiago subsequently retrieved from the car. Id. In the belief that the trinket hanging from the rear view mirror violated a state statute, the officer conducted a computer check on Santiago's license and registration. Id. After

15

the checks came back negative, the officer continued to question Santiago about the car's registration.  Id. at 339.  Before allowing Santiago to leave, he asked for and obtained consent to search, from which he discovered drugs.  Id.  As in Dortch and Jones, however, we found this detention unlawful because it extended beyond the negative computer check.

Nevertheless, the completion of a computer check is not the exclusive dividing line between constitutional and unconstitutional detention.  Ultimately, as the Supreme Court has reiterated, the "scope of the detention must be carefully tailored to its underlying justification."  Royer, 460 U.S. at 500.  Although mere questioning may not violate the Fourth Amendment, that "is not to say that questioning is unrelated to the determination that a detention has exceeded its lawful duration."  Shabazz, 993 F.2d at 436.  We have concluded that "questioning unrelated to the justification for the stop that extends the duration of the stop violates the Fourth Amendment."  United States v. Machuca-Barrera, 261 F.3d 425, 432-33 n.21 (5th Cir. 2001) (citing Shabazz, 993 F.2d at 437).  In such circumstances, the scope of the detention exceeds the underlying justification and thus is unconstitutional.

To determine whether questioning is unrelated to the purpose of a stop, we must examine the identifiable reasonable suspicion that justified the detention.  An officer may take the time necessary to investigate such reasonable suspicion, but when his questioning extends beyond that reasonable suspicion, and it

16

lengthens the duration of the stop, the detention is unreasonable. The linchpin for analyzing the reasonableness of a detention, therefore, is the scope of reasonable suspicion, i.e., the reasonable suspicion that justified the detention, rather than the completion of a computer check.

Our case law abundantly demonstrates the focus we have placed on the scope of reasonable suspicion in deciding whether a detention was lawful. Dortch, Jones and Santiago emphasized that the circumstances surrounding the respective detentions, in keeping with the totality of the circumstances approach which is applied, permitted only a reasonable suspicion of a stolen car.[4] The Dortch court concluded that suspicious and inconsistent answers, Dortch's alleged nervousness, confusion as to the relationship of Dortch to the vehicle's renter, and Dortch's absence as an authorized driver on the rental contract "gave rise only to a reasonable suspicion that the car might have been stolen." 199 F.3d at 199. None of this evidence, the Court held, created a "reasonable or articulable suspicion that Dortch was trafficking in drugs." Id. Similarly in Jones, we concluded that inconsistent answers about the driver's employment and the driver's acknowledgment that he had been arrested previously on a crack cocaine charge were "at best trivial" grounds for reasonable suspicion of drug trafficking, and

---

[4] The factual circumstances of Santiago also may have permitted reasonable suspicion of the abduction of the children that were in the car. 310 F.3d at 342.

17

even less suggestive than the evidence put forward in <u>Dortch</u>. 234 F.3d at 241-242. In <u>Santiago</u>, we concluded that extreme nervousness, potentially inconsistent stories between Santiago and his female passenger, and other possibly suspicious answers did not establish "reasonable or articulable suspicion that Santiago was trafficking in drugs . . . ." 310 F.3d at 338-39, 342 (citing <u>Dortch</u> and <u>Jones</u> to similar effect). Because the only permissible reasonable suspicion was dispelled when the computer checks came back, we found any additional detention unlawful. Finally, to confirm that the permissible scope of reasonable suspicion, and not the computer check, guides our reasonableness analysis, we even have held that detaining someone <u>until</u> the completion of a computer check can unreasonably prolong detention. In <u>United States v. Valadez</u>, we concluded that once the police determined that the vehicle's window tinting was legal (the reason for the stop), there was no reason to detain the defendant further, not even to wait for the completion of a computer check on his license. 267 F.3d 395, 396, 398 (5th Cir. 2001). In short, we have strictly limited the scope of the detention to the identifiable reasonable suspicion that originally justified the stop.

In this case, the justification for the stop, driving too closely, permitted Conklin to require Brigham to show his driver's license and the car's papers. <u>Dortch</u> instructs that, upon noticing that Brigham was not authorized to drive the rental vehicle and that the renter of the vehicle was not present, Conklin then had a

18

valid reasonable suspicion about whether the car was stolen.[5]  Any suspicion of drug trafficking, however, was <u>not</u> warranted.

Conklin's methodology, questioning unrelated to the traffic violation for eight minutes <u>before</u> commencing the computer check, is merely an impermissible variation on the same <u>Dortch</u>/<u>Jones</u> tune: If a stop is unconstitutionally prolonged by continued questioning <u>after</u> a computer check is complete, then delaying the commencement of the computer check and asking unrelated questions during such delay is equally proscribed.  Conklin certainly prolonged the detention, as he could have (and should have) started the computer check before beginning his extensive questioning.  The fact that the prolongation is caused by <u>ex</u> <u>ante</u> rather than <u>post</u> <u>hoc</u> questioning matters not.

There is ample evidence that (1) Conklin's initial questioning served drug interdiction purposes rather than the purpose of determining whether the rental car was stolen,[6] and (2) such

_____

[5] In our view the "simplest, quickest and least intrusive means" to satisfy an officer's suspicion that a vehicle might be stolen is to immediately run a computer check on the vehicle's license plate to see if it has been reported stolen.  If it has, the officer has probable cause to arrest the driver and occupants for possession of a stolen vehicle and to search the vehicle consequent upon such arrest.  If the vehicle has not been reported stolen, the officer's suspicions, based on facts like those in this case, can no longer justify extension of the stop to investigate that suspicion.

[6] We note that at one point on the videotape immediately before he asked Brigham for consent to search, Conklin told Brigham that one of his "jobs is to patrol for contraband."  Likewise, in a conversation which Conklin had with the local police officer on

19

questioning was simply unrelated to the scope of the stop, thereby unreasonably prolonging the detention. When Conklin received Brigham's license and the rental contract, he had valid reason to wonder whether the car might have been stolen. He testified that he quickly realized that the woman who rented the car was not present; but he failed to notice that the address on Brigham's license and the address of the renter were identical, even though Brigham had identified the renter as his mother. And although Conklin noticed that the renter, Harris, was 50 years old, and that Brigham was under 25 years old, the officer did not recognize that Harris was an appropriate age to be Brigham's mother. In short, the data plainly in front of Conklin was that (1) Brigham was not authorized to drive the car, (2) Harris was not present, (3) Brigham and Harris shared the same address, and (4) the age difference between Harris and Brigham was characteristic of a parent-child relationship, which was the information given in response to Conklin's question.

Rather then ask Brigham more about the rental agreement, however, Conklin launched into a series of unrelated questions about the particulars of Brigham's trip. When Conklin finally did ask who had rented the vehicle, and Brigham responded that it was

the videotape, he advised that local officer that he was going to "try to get consent to search, but would search anyway because none of the occupants had standing to protest." A search of a vehicle if you suspect the presence of drugs might make some sense; a search of a vehicle if you suspect the vehicle is stolen has virtually no likelihood of finding anything relevant.

his mother, it was proper for Conklin to notice, for whatever it is worth, that they did not share the same last name. It was a significant oversight, however, to fail to notice that the addresses of both persons and their age differences corroborated Brigham's answer. Instead of questioning whether Brigham's mother had given him permission to use the car and quizzing Brigham on personal information put down by Harris on the agreement, questions that might have resolved whether Harris was really Brigham's mother, or simply doing a computer check on his license and on whether the car was reported stolen, Conklin then approached each of the other passengers seriatim and repeatedly posed the same battery of unrelated questions to each of them. Rather than ask the passengers about Brigham, how he had gotten the car, and who Dorothy Harris was, Conklin asked each passenger the same detailed questions about their trip. We cannot perceive how identifying the hotel at which they stayed in Houston was more likely to uncover whether the car was stolen than questioning them about the vehicle's renter and how Brigham had obtained the car.

Furthermore, our review of the record in this case indicates that the stories of Brigham and his companions were more consistent than inconsistent. All persons Conklin questioned told him they were on a trip for pleasure and were coming back from Houston. In addition, the two individuals Conklin asked about lodging (Brigham and Franklin) told him that the group had stayed at a La Quinta Inn. Third, the stories they gave as to the time of arrival in

21

Houston were only marginally inconsistent.  Brigham told Conklin that they had arrived Friday morning; Franklin indicated that they had arrived later on Friday, but then said he was not exactly sure what time on Friday they had arrived; and after some confusion between the other two passengers, they indicated that they had arrived Friday morning.  Thus, all the car passengers put their arrival in Houston at some time on Friday.  The only fairly likely inconsistency resulted when Conklin asked Brigham and Franklin who they knew in Houston: Brigham said they knew family of Franklin's, but Franklin said he knew "a couple of girls" there and never denied having family in Houston.

The government argues that the initial period of questioning is immaterial because Conklin also could have begun the computer checks immediately, and questioned the defendant and other passengers while the checks were running.  Assuming that Conklin would otherwise have conducted the stop the same way, the government's argument continues, he would have discovered Franklin's false identification, giving him adequate reason to extend the detention, and then ask for consent to search the vehicle.  In its brief, the government points out that the facts of Jones illustrate a similar pattern of questioning before the computer check, and argues that our lack of criticism of this method in Jones supports its reasonableness here.  Our opinion in Jones, however, shows fairly clearly that we found the facts of that case most analogous to Dortch, because both cases involved

detention after the completion of a computer check.  Based on such similarities with recent precedent, there was simply no need to scrutinize the questioning that occurred before the computer check.  Additionally, it is true that a police officer may run a computer check on a driver's driver's license and registration or insurance papers.  Shabazz, 993 F.2d at 437; Dortch, 199 F.3d at 198.  It is less clear, however, whether police may run checks on passengers' licenses.[7]  We need not, and therefore do not, decide that issue in this case because instead we are able to conclude that the pre-computer check questioning made the detention unreasonable.  In Jones, the court did not have to directly address this issue because the defendants appeared to concede that the police could request and run a computer check on both defendants' licenses.  234 F.3d at 240.

Nonetheless, even considering Franklin's fake identification as a factor, the government's argument misses the whole point.  Although it may be true that Conklin could have used a method that

---

[7] Our search of the statutes of the State of Texas failed to turn up any statutory provision which requires a passenger in a vehicle to carry his driver's license or any other type of identification so long as he is just a passenger.  Likewise, we found no statutory provision which would attribute liability to a passenger for a traffic violation committed by the driver, such as "following too close" in this case.  We have doubts therefore that the reason for the initial traffic stop (i.e., following too close) in this case gives the trooper any ground for suspicion of criminal conduct on the part of a passenger.  If a police officer arrests an individual, that person is required to give his true name, residence address and date of birth to the arresting officer.  See Texas Penal Code § 38.02.  None of the passengers in the vehicle in this case were arrested at the time of the initial traffic stop.

23

is less open to criticism, the fact remains that he failed to use the least intrusive means. The Supreme Court has firmly stated that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Royer, 460 U.S. at 500. It is true that Conklin could have collected Brigham's license and rental car papers to run them through a computer check, and then questioned Brigham and his companions while this check was being run, but this only illustrates that Conklin's actual conduct was not the "least intrusive means reasonably available." Here Conklin took an extended amount of time to ask unrelated questions which made the detention unreasonable.

We also recognize that some of our previous cases discussing the reasonableness of a detention focused on the impermissible questioning that occurred toward the end of a traffic stop. In Shabazz, we noted that "the nature of the questioning during a later portion of the detention may indicate that the justification for the original detention no longer supports its continuation." 993 F.2d at 436. In Dortch, Jones and Santiago, moreover, our emphasis was on questioning that took place after the computer checks returned. Although this case concerns a period of questioning that occurred before the computer check, we see no principled distinction between the circumstances here and those

24

that have come before. We cannot countenance an effective end-run, even if inadvertent, around our recent precedent, which extensive pre-computer check questioning on matters unrelated to the justification for the stop ultimately achieves. Obviously, if a police officer is prohibited from extending questioning beyond the computer check on matters outside the scope of permissible reasonable suspicion, he is equally prohibited from burning such time and intruding in such a way to investigate an impermissible reasonable suspicion before he initiates the check. Otherwise, the officer could easily and completely circumvent the constitutional guarantees afforded to individuals detained during traffic stops simply by embarking on such questioning before the check rather than afterwards. Regardless of when these questions are posed, if they are unrelated to the reason for the which the traffic stop was made (here "following too closely") or to the suspicion that the driver is wanted or the car was stolen, and they extend the duration of the stop, the detention becomes unlawful.

Finally, holding that this type of detention is reasonable likely would put at risk a large segment of the population for reasonable suspicion of drug trafficking and concomitantly the same type of intrusive detention that occurred in this case. In Dortch, we recognized that upholding the officer's conduct would be tantamount to finding that "officers have reasonable suspicion to suspect drug trafficking anytime someone is driving a rental car that was not rented in his name." 199 F.3d at 199. The same

25

conclusion can be drawn here: Upholding the prolonged, extensive questioning in light of the dearth of evidence that Trooper Conklin had at his disposal before a computer check was even initiated would seem to allow police to suspect drug trafficking or other illegal activity of anyone who is driving a car registered to someone who is not present in the vehicle or who has a different last name.  It would not appear to matter whether the driver is operating a car rented in another's name or owned in another's name; the police would still be confronted with a driver's license and registration and insurance papers that do not match up.[8] Deciding this case as the government requests would effectively permit the police to ignore the explanation given by the driver, and such corroborating evidence as having the same address, so as to pursue prolonged questioning and develop further reasons to detain —— a quintessential fishing expedition.

We do not imply that questions like those asked by Trooper Conklin are themselves off limits to police officers conducting traffic stops.  Under other circumstances, such as while awaiting a report from a timely initiated computer check, we have allowed these types of questions in previous cases.  Neither do we want to put ourselves in a position that forces us constantly to second-guess the sequence of police questioning.  See Dortch, 199 F.3d at

---

[8] This group potentially includes all children who drive a parent's car but have a different last name than that parent, a spouse who drives a car registered to a spouse whose last name he or she does not share, and anyone who borrows a car from a friend.

26

200 (finding that courts "'should not indulge in unrealistic second-guessing' of the methods employed by the officers on the scene") (citing United States v. Sharpe, 470 U.S. 675, 686 (1985)). In this case, however, Conklin's questioning indisputably extended Brigham's detention, yet was at best unrelated to the permissible scope of his reasonable suspicion and at worst illustrated his suspicions of drug trafficking or illegal activity other than a stolen car or a driver with "wants and warrants." The evidence before Conklin, in conjunction with the narrow scope of his detention to investigate whether the car was stolen, did not justify questioning that unlawfully prolonged Brigham's detention in violation of the Fourth Amendment. See Sharpe, 470 U.S. at 686-87 (stating that detention is unlawful when "police act[] unreasonably in failing to recognize or to pursue [alternative means to a seizure,]" not simply when a judge is able to conceive of other alternatives).

**Validity of Brigham's Consent**

It is well established in this Circuit that "[c]onsent to search may, but does not necessarily, dissipate the taint of a [F]ourth [A]mendment violation." United States v. Chavez-Villarreal, 3 F.3d 124, 127 (5th Cir. 1993). To show valid consent after an unlawful detention, the government has the heavier burden of establishing that (1) "consent was voluntarily given," and (2) such consent "was an independent act of free will." Id.

27

Normally, the district court's conclusion as to the voluntariness of consent is a finding of fact based on a totality of the circumstances, which we only review for clear error. Shabazz, 993 F.2d at 438. The district court concluded, in light of the available evidence, that Brigham's consent was voluntary. Given the deferential standard of review from which we operate, we cannot conclude that the court was clearly erroneous. Because the district court in this case did not find an unlawful detention, however, it did not consider the second prong of the analysis —— whether consent was an independent act of free will. As a result, we owe no special deference when determining whether consent was an independent act of free will. See Dortch, 199 F.3d at 201-02.

In determining the validity of consent after illegal detention, the second prong focuses on the "causal connection with the constitutional violation" and requires examination of three factors "[t]o determine whether the causal chain was broken . . . ." Chavez-Villarreal, 3 F.3d at 127-28. We consider: "(1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct." Id. at 128.

First, there is some evidence that the temporal proximity between the illegal conduct and consent in this case is not as close as it was in Jones and Dortch. Between the intrusive questioning and Brigham's later consent was a period of at least ten minutes during which Conklin conducted a computer check and

28

Brigham waited on the side of the road. This span of time, however, did not mitigate the violation. Indeed, the period subsequent to Conklin's initial questioning exacerbated the taint of the illegal conduct. The entire prolonged detention, which included the initial questioning and the computer check, did immediately precede Brigham's consent. Brigham was still outside of his car and local Nacogdoches police had arrived to back up Conklin when Conklin asked for consent. Finally, Conklin appeared to become more aggressive upon discovery of Franklin's fake identification. Thus, even though Brigham's actual consent occurred over ten minutes after the initial questioning, none of the interceding events would have given him any basis for believing that he was free to leave.

Second, as described above there were no intervening circumstances between the detention and the consent such that Brigham would have sensed he could leave. Conklin never informed Brigham that the check on the car and his license had come back clean, he intensified his demeanor as the stop wore on, and the local police arrived as back-up. In short, Brigham was still detained when Conklin requested consent to search the vehicle. In fact, for the entire duration of the stop up until the search, Brigham was away from the rental car and next to the patrol vehicle, while Franklin was in front of the rental car off into the ditch, and the other passengers were in the car. After asking for consent, Conklin patted down Brigham and instructed Brigham to wait

29

off in an area behind the rental car. Brigham and the other passengers were watched by the local police officers and at one point told not to speak to each other.

Third, the purpose and flagrancy of the initial misconduct is fairly transparent. We have already recognized that even when an officer's purpose cannot be known, his intentions may be gleaned from the record and videotape. <u>Dortch</u>, 199 F.3d at 202. In this case, there is even less of an inferential leap than was required in <u>Dortch</u>. Conklin's immediate questioning of Brigham was completely unrelated to determining why Brigham had a rental car he was not authorized to drive or to the purpose of the stop, which was following too closely and a possible seatbelt violation. Conklin overlooked fairly obvious indications, <u>e.g.</u>, that Brigham and Harris shared the same address, which suggested Brigham was telling the truth. He persisted in intrusive questioning of all the other passengers about matters that were not related to how Brigham came into possession of the rental car. Finally, before he learned about Franklin's fictitious license, he noted that it was probable none of the passengers had standing to contest a search; and later he elaborated on this thought by remarking that because there was no standing he would probably search even if Brigham did not consent.

In sum, after evaluating these three factors, we conclude that Brigham's consent was not an independent act of free will. As a result, his subsequent consent does not cure the Fourth Amendment

30

violation.

## CONCLUSION

Having carefully reviewed the record of this case, the parties' respective briefing and arguments, for the reasons set forth above, we vacate Brigham's conviction and sentence and remand for entry of a judgment of acquittal.

ENDRECORD

31

EDITH H. JONES, Circuit Judge, dissenting:

I respectfully dissent. Based on their own appellate fact finding, the majority have further narrowed what our court permits as law enforcement activity during traffic stop detentions. See United States v. Santiago, 310 F.3d 336 (5th Cir. 2002); United States v. Jones, 234 F.3d 234 (5th Cir. 2000); United States v. Dortch, 199 F.3d 193 (5th Cir. 1999). Although the majority's holding is far from clear, its import seems to be that if a law enforcement officer's questions to vehicle occupants may be construed as serving "drug interdiction purposes", and the questions occur before he runs computer checks on the ownership of the vehicle and the occupants' identifications, the scope and length of the detention are unconstitutionally prolonged.

This is new territory indeed. Dortch and Jones rigidly applied the rule that a prolonged detention after the completion of a traffic stop may be unconstitutional. In both those cases, however, the officers asked vehicle occupants nearly the same series of questions that were posed here, yet this court never criticized the questions. Jones, 234 F.3d at 237; Dortch, 199 F.3d at 195-96. The district court analyzed this case according to Dortch and Jones and found no inconsistency. The majority now states, on one hand, that in a "legitimate traffic stop," the officer may investigate the occupants' right to possess the

32

vehicle, but on the other hand, the questions asked here somehow went beyond that purpose. In any event, according to the majority, the investigation did not use the least intrusive means, since the officer might have asked the very same questions <u>during</u> the computer check of occupants' identifications, but instead chose to ask those questions <u>before</u> the check began; the detention was thus unconstitutionally prolonged by his inefficiency.

So many problems arise from this opinion that one scarcely knows where to start listing them. First, the panel majority is wrong in asserting that Trooper Conklin's methodology made an "end-run" around <u>Dortch</u> and <u>Jones</u>. The majority opines that Trooper Conklin should have questioned Brigham and his companions while conducting the computer records check, and that "delaying the commencement of the computer check and asking unrelated questions during such delay [are] equally proscribed." In <u>Jones</u>, the officer questioned the vehicle occupants for seven minutes before initiating a computer check. 234 F.3d at 237. Yet no criticism of that aspect of police activity appears in this court's opinion.

Further, the majority's conclusion contradicts the holding of this court in <u>United States v. Roberson</u>, 6 F.3d 1088 (5th Cir. 1993). In <u>Roberson</u>, a state trooper pulled over a minivan for failure to signal a lane change. <u>Id.</u> at 1089. After the car pulled over, the state trooper approached the vehicle and

33

> instructed McCleod [the driver] to produce her driver's license, registration, and proof of insurance. McCleod informed him that the car was leased by a third party and produced a copy of the lease agreement. The lease to one Cheryl Allen did not identify McCleod as an authorized driver and the lessee was not among the passengers. Trooper Washington began to suspect that the vehicle might have been stolen. At this point, McCleod volunteered that she was a friend of Allen and that Allen was in St. Louis. McCleod claimed to be returning home after taking her mother to her grandmother's home in Houston.
>
> Trooper Washington then asked the passengers for identification. Roberson [a passenger] could not produce a driver's license, but claimed responsibility for the car, stating that Allen had loaned it to him. Roberson told the trooper that Allen was still in Houston and would be returning to St. Louis in another vehicle. His suspicion further aroused, Trooper Washington decided to call Deputy David Deter for backup.

Id. at 1089-90. After Deputy Deter arrived, the officers asked the driver her grandmother's phone number and address. Id. When the driver was unable to answer, the officers asked for consent to search her car. After receiving consent, the officers discovered 6.99 kilograms of cocaine. The court concluded that such questioning, which appears to be virtually identical to the questioning performed by Trooper Conklin, neither impermissibly prolonged the detention nor vitiated the driver's consent to search. Id. at 1092-93 (citing United States v. Shabazz, 993 F.2d 431, 437 (5th Cir. 1993) and Schneckloth v. Bustamonte, 412 U.S. 218 (1973)).

34

Not only does the majority's decision conflict with the prior precedent of this circuit, but it also conflicts, or at least is in tension with, the precedent of at least five other circuits. United States v. Burton, 2003 U.S. App. Lexis 13426 at *12-14 (6th Cir. July 2, 2003) (holding that asking questions of the driver of a car being ticketed for illegal parking that were unrelated to the issuance of the citation was permissible); United States v. Gregory, 302 F.3d 805, 809 (8th Cir. 2002) (holding that questioning of driver and passenger regarding identity and travel plans prior to running computer check was reasonable for Fourth Amendment purposes), cert. denied, 123 S. Ct. 1815 (2003); United States v. Childs, 277 F.3d 947, 954 (7th Cir.) (en banc) (stating that brief questioning unrelated to traffic stop that occurred prior to commencement of computer check did not unconstitutionally prolong detention), cert. denied, 123 S. Ct. 126 (2002); United States v. Sowers, 136 F.3d 24, 27-28 (1st Cir. 1998) (affirming denial of suppression motion where officer engaged in questioning of driver and passenger regarding the "extent, purpose, and details of their travels" prior to running computer check); United States v. Hardy, 855 F.2d 753, 757 (11th Cir. 1988) (affirming denial of suppression motion and noting that fifteen minutes of questioning regarding travel plans and travel history prior to running computer check was part of investigation of the traffic violation).

Second, the majority finds, without citing a shred of record support and without any support from the district court's findings, that Trooper Conklin's questions about the Brigham party's trip were for "drug interdiction purposes." This *de novo* fact finding is contrary to two principles: we are bound, absent clear error, by the district court's findings of fact in suppression cases, and on appeal, we are to review the findings in the light most favorable to the prevailing party, here, the government. Jones, 234 F.3d at 239. The district court found that:

> Trooper Conklin's detention of Defendants was reasonably related to the circumstances which justified the interference in the first place. Trooper Conklin was entitled to ask Brigham for his license and registration. See Shabazz, 993 F.2d at 437. Upon examining the rental contract and discovering that the only person authorized to drive the vehicle was not in it, it was reasonable for the Trooper to briefly question why Brigham, an unauthorized driver pursuant to the terms of the rental contract, was in the car. Trooper Conklin justifiably became suspicious when Franklin told him Defendants had gone down to Houston for an Isley Brothers concert and that he knew a couple of girls (but made no mention of family in Houston when the Trooper asked him if he knew anyone else in Houston), whereas Brigham had told him that they were visiting Franklin's family. Defendant Perry's explanation was inconsistent with both the explanation offered by Brigham and that offered by Franklin. The absence of the authorized driver, the inconsistent explanations as to the trip to Houston, and Franklin's presentation of a fictitious I.D., taken together, justified Trooper Conklin's continued detention of Defendants. Accordingly, Defendants' motions to suppress evidence on the basis that their detention exceeded the reasonable scope of the stop's original purpose are denied.

36

The majority, without explanation, discredits these findings to which this court should defer.

Even on its own terms, the majority's finding makes little sense, as the trooper's line of questioning was obviously germane to investigating Brigham's right to possess the vehicle and to many other benign or law enforcement-related purposes.

> The Fourth Amendment grants an officer conducting a routine traffic stop latitude to check the driver's identification and vehicle registration, ask the driver to step out of his vehicle and over to the patrol car, inquire into the driver's destination and purpose for the trip, and "undertake similar questioning of the vehicle's occupants to verify the information provided by the driver."

Gregory, 302 F.3d at 809 (quoting United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002)). Thus, Trooper Conklin's questioning was fully within the boundaries of the Fourth Amendment based upon his having probable cause to believe that a traffic violation occurred. But even if one does not accept this basis for the questioning, there exists an alternative basis supporting the questioning. The majority concedes that, in light of Dortch, Trooper Conklin had a reasonable suspicion that the car was stolen prior to his questioning of Brigham and his passengers. Majority Opinion at 19. This court has previously found questioning almost identical to Trooper Conklin's to be permissible where the officer had a reasonable suspicion that the car was stolen. See Roberson, 6 F.3d at 1092-93 (finding questioning identical to questioning in

37

this case permissible based on a reasonable suspicion that the car was stolen).

Third, even if drug interdiction was Trooper Conklin's motivation for asking the questions, his motivation is wholly irrelevant for Fourth Amendment purposes. The majority's reasoning flies in the face of Whren v. United States, which held that Fourth Amendment activities must be judged in light of the objective facts rather than law enforcement officers' subjective motives. 517 U.S. 806, 812-13 (1996).

Fourth, the majority equates the failure of Trooper Conklin to employ the "least intrusive means" of investigation with unreasonableness for purposes of the Fourth Amendment. There is no doubt that law enforcement officers may both question the occupants of a vehicle which is stopped for reasonable suspicion as well as for engaging in traffic violations, and may perform computer records checks of the vehicle and its occupants. Shabazz, 993 F.2d at 437. The majority holds, as a constitutional matter, that these activities must be done simultaneously, not *seriatim*, in order for an investigation to be performed via the least intrusive means.

But it does not follow that failing to use the "least intrusive means" of investigation is per se constitutionally unreasonable. In fact, so to hold conflicts with the precedent of this Circuit. This Court has stated that:

> The fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive'

38

> means does not, by itself render the search unreasonable. The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize it or to pursue it.

United States v. Sanders, 994 F.2d 200, 204 (5th Cir. 1993)(Wiener, J., joined by Barksdale and DeMoss, JJ.) (quoting United States v. Sharpe, 470 U.S. 675, 687 (1985)). Thus, the question before this court, properly framed, is whether it was unreasonable for Trooper Conklin to engage in a line of questioning for eight minutes prior to running a computer check rather than asking the very same questions during the computer check (which the majority concedes would be permissible). In my mind, the answer to this question is unequivocally "no."

Here the entire investigation was directed to the concededly legitimate purpose of enforcing the traffic laws. See Gregory, 302 F.3d at 809; Shabazz, 993 F.2d at 437. In such a case, vehicle occupants should not have the constitutional right to object to the mode of procedure as long as there is no excessively long detention. As the government points out, this detention was prolonged at least as much by the fact that Franklin provided the trooper with a bogus identification card, requiring a second computer check to occur, as it was by Trooper Conklin's decision to ask questions first. Moreover, under the majority's reasoning, it would apparently be constitutionally permissible if Trooper Conklin had gone to each vehicle occupant and run his or her identification check separately while questioning only that individual during the

39

process of the computer check.  Such a procedure would, however, be absurd.

Fifth, Brigham does not contest the district court's finding that he voluntarily consented to a search of the car. Instead, the majority reverses under this court's now-virtually per se rule that if a traffic stop detention is "unduly prolonged," there can be no legal consent to search.  Neither Brigham nor the majority suggest that the detention was prolonged for the purpose of obtaining consent to search – consent was given six minutes <u>before</u> Trooper Conklin received the transmission from his dispatcher concerning Franklin's real name.  This case is distinguishable from <u>Dortch</u>, <u>Jones</u>, and <u>Santiago</u>, because in those cases, consent was extracted after the traffic stops had been completed and thus at a time when, without reasonable suspicion, the defendant should have been allowed to depart.

The above errors infect the majority's opinion even if one assumes that <u>Dortch</u>, <u>Jones</u>, and <u>Santiago</u> properly reflect Fourth Amendment jurisprudence.  While those cases are binding law in this circuit, I believe they are too broadly written, and I subscribe to the dissents of Judges Garwood and Emilio Garza in two of those cases.

I suggest that the reasoning of the Seventh Circuit in Childs,[9] more correctly applies Fourth Amendment reasonableness principles to individual traffic stops. As the court noted:

> Questions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention. They do not signal or facilitate oppressive police tactics that may burden the public--for all suspects (even the guilty ones) may protect themselves fully by declining to answer. Nor do the questions forcibly invade any privacy interest or extract information without the suspects' consent.

Childs, 277 F.3d at 954. In short, I believe this case is wrongly decided under Dortch, Jones, and Santiago. Alternately, that line of cases is incorrect and should be reconsidered by our court en banc.

---

[9] 277 F.3d 947 (7th Cir.) (en banc), cert. denied, 123 S. Ct. 126 (2002).